# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **WILLIAM JEWETT, JR.,**<br>**Petitioner** | ) ) ) |
| | ) |
| **v.** | )    Civil Action No. 05-11849-GAO |
| | ) |
| **BERNARD BRADY,**<br>**Respondent** | ) ) ) ) |

## PETITIONER'S MEMORANDUM IN SUPPORT OF
## PETITION FOR *HABEAS CORPUS* RELIEF

Petitioner, William Jewett, Jr., has petitioned this Court, pursuant to 28 U.S.C. § 2254, for a writ of *habeas corpus* to issue, providing petitioner with relief from his unjust and unconstitutional state court imprisonment. The petition sets forth six independent grounds for the issuance of the writ:

1.    Petitioner received ineffective assistance from his trial counsel, who failed to recognize and develop evidence that the sperm in this case was 24 hours older than the Commonwealth's version of the facts would allow;

2.    The Commonwealth's failure to present the true age of the sperm to the grand jury in response to grand juror's questions violated Petitioner's right to a fair grand jury;

3.    The Commonwealth's arguments to the trial jury that the alleged rape happened immediately prior to death, when its own expert said the sperm was older than that, violated petitioner's due process rights;

4.    That there was a substantial likelihood of miscarriage of justice based on various factors, specifically including: improper expert opinion of sexual assault; lack of a proper jury

instruction on accident; and improper admission of prejudicial statements made by the defendant;

5.      That petitioner's appellate counsel was ineffective in failing to raise the issue of juror misconduct on appeal; and

6.      That petitioner's appellate counsel was ineffective in failing to raise a Sixth Amendment ground for reversing the conviction based on the improper admission of expert opinion on sexual assault.

This memorandum sets forth the reasons why the petition must be allowed.

### STATE COURT PROCEEDINGS

Petitioner was indicted in Plymouth County on October 6, 1997.  *See* Supp. Ans., Ex. 1.[1] He was convicted of rape and first-degree murder on November 23, 1998, after a jury trial.  *Id.* He timely filed a notice of appeal to the Massachusetts Supreme Judicial Court ("SJC") on November 24, 1998.  *Id.*  During the pendency of the appeal, on May 22, 2003, petitioner filed a Motion for New Trial in the SJC, which was referred to the trial court by the SJC.  *See* Supp. Ans., Exs. 1, 7.

The Motion for New Trial argued, among other issues, that the prosecution's version of events, that petitioner raped and killed Jennifer Mullin, the decedent herein, while taking her home from a party, was disproved by evidence that the sperm found in Mullin's panties and vagina was deposited from twenty-four to thirty-six hours prior to the victim's death.  *See* Supp. Ans., Ex. 4.  Petitioner asserted that 1) the failure of his trial counsel to develop this evidence

---

[1] Petitioner cites Respondent's Supplemental Answer herein as "Supp. Ans., Ex. ___."  Petitioner cites Respondent's Supplemental Answer II herein as "Supp. Ans. II, Ex. ___."  Page numbers within the exhibits are also supplied for the larger exhibits.  Petitioner cites the trial transcript as "Tr. Volume [Number], p. ___."

constituted ineffective assistance of counsel; 2) the Commonwealth's failure to present it to the grand jury violated his right to a grand jury indictment; and 3) the Commonwealth's arguments to the jury that the alleged rape happened immediately prior to death, when its own expert said otherwise, violated petitioner's due process rights. *Id*. The motion judge, who was not the judge who heard the original trial, denied the Motion for New Trial without a hearing. *See* Supp. Ans., Exs. 1, 4. Accordingly, there has never been a state court evidentiary hearing on this crucial issue.

Petitioner appealed from the denial of the new trial motion, and that appeal was consolidated with the original appeal for hearing before the SJC. *See* Supp. Ans., Exs. 1, 4, 7. Each of the above arguments with regard to the violations of defendant's rights was made to the SJC and addressed in its decision. *See* Supp. Ans., Exs. 3, 6. These claims constitute the first three claims in the defendant's petition. The fourth claim in the petition, that there was a substantial likelihood of miscarriage of justice based on various factors, specifically including: improper expert opinion of sexual assault; lack of a proper jury instruction on accident; improper admission of prejudicial statements made by the defendant; and the inherent weakness of a jailhouse confession, was also argued to and heard by the SJC in petitioner's first appeal. *Id*. On August 12, 2004, the SJC affirmed the convictions. *See* Supp. Ans., Ex. 6. On August 23, 2004, petitioner filed a petition for rehearing, which was denied on September 10, 2004.[2] *See* Supp. Ans., Ex. 7.

In early September, 2005, contemporaneously with the filing of this petition, petitioner,

---

[2] The petition for rehearing first raised defendant's Sixth Amendment claim regarding the improper expert opinion of sexual assault. See Supp. Ans. II, Ex. 11 (letter of August 19, 2004, Myles Jacobson, Esq., to Chief Justice Margaret Marshall)

acting *pro se*, filed with the state court and served on the Plymouth County District Attorney's

Office a second Motion for New Trial, raising issues of ineffectiveness of appellate counsel for

failing to raise petitioner's claim for juror misconduct and his 6th Amendment confrontation rights

in his direct appeal to the SJC.[3]  This Court allowed a stay of the petition to exhaust these claims,

as they could not have been raised by petitioner in his direct appeal.  *See Rhines v. Weber*, 544

U.S. 269 (2005); *Neverson v. Bissonnette*, 261 F.3d 120, 126 n.3 (1st Cir. 2001).

Petitioner's Motion for New Trial was denied by the state trial court without hearing on

June 13, 2006.  Supp. Ans. II, Ex. 9.  Petitioner requested permission from the SJC for leave to

appeal that denial, as required by M.G.L. c. 278, § 33E.  Supp. Ans. II, Ex. 11.  The SJC denied

petitioner leave to appeal, exhausting these claims in state court, on April 17, 2007.  Supp. Ans.

II, Ex. 13.

## FACTS DEVELOPED AT TRIAL

The following are the facts most favorable to the Commonwealth, as described by the

SJC's decision on appeal.  *Commonwealth v. Jewett*, 442 Mass. 356, 357 (2004).  Petitioner and

Mullin had known each other for a number of years, but had not been publicly romantically

involved.  *Id.*  On the evening of January 29, 1993, they were both at a party at a mutual friend's

apartment in Weymouth. Between midnight and 1 A.M. on January 30, 1993, at the end of the

party, petitioner offered to drive the victim home. *Id.*  A friend had to assist petitioner in starting

his car, which was having engine trouble, and the friend followed petitioner and Mullin for a

---

[3] This motion was originally improperly filed in the SJC, and was therefore not docketed
by the state court.  A Motion for New Trial in a first degree murder case is filed in the SJC during
the pendency of the appeal from the convictions, but after the appeal is resolved, such a motion is
properly filed in the Superior Court.  Massachusetts General Laws, Chapter 238, § 33E.  The
Motion for New Trial was properly filed in the Superior Court on June 5, 2006.  Supp. Ans. II,
Ex. 9.

time in his truck, until they determined petitioner's car was running acceptably. *Id.*, at 357-358.

Mullin had a 12:30 A.M. curfew. *Id.*, at 358. At approximately 1 A.M., when she had not yet arrived home, her mother contacted the hosts of the party. *Id.* By morning, both of Mullin's parents, as well as some of her friends, began looking for her. On learning that Mullin had left the party with the petitioner, her father telephoned petitioner. *Id.* Petitioner told him that he had dropped Mullin off at the end of her street at about 12:30 A.M., because she wanted to finish her beer before going home. *Id.*

That afternoon Mullin's body was discovered near Turner Road in Rockland, lying partially covered by pine needles, twigs, and leaves in a wooded area. *Id.* Dr. James Weiner, a State medical examiner, declared Mullin dead at the scene and conducted a preliminary examination of the body, which revealed that her clothes were disheveled and she appeared to have been redressed. *Id.* The body was moved to the medical examiner's office, where Dr. Weiner concluded that Mullin had died around 1:30 A.M. *Id.* He learned that she had likely died elsewhere, and the body was moved to the Turner Road area after her death. *Id.* He prepared a rape kit, collecting semen from the victim's underwear and vagina, and sent the kit to the State laboratory for analysis. *Id.*

An autopsy was done by Dr. William Zane, also with the State medical examiner's office, who determined that the victim had died from asphyxia. *Id.* Other forensic evidence presented by the Commonwealth purported to show a high probability that the semen found on Mullin's underwear matched the petitioner, and that a green thread found in petitioner's car was similar to Mullin's blouse. The semen recovered from Mullin's vagina could not be positively matched to petitioner, but he was also not excluded as a potential match. *Id.*, at 359.

5

The Commonwealth's other evidence included several witnesses who saw or heard a car reminiscent of petitioner's in the area of Turner Road the morning of January 30, 1993.  *Id.*  The Commonwealth also presented evidence of petitioner's alleged nervous or agitated behavior in the days after Mullin's death.  *Id.*  Petitioner repeatedly denied having had intercourse with Mullin.  *Id.*  Finally, the Commonwealth presented evidence of an alleged jailhouse confession to the charged crimes, supposedly made to an inmate, Mark Obershaw, after petitioner had been arrested for the crimes.  *Id.*, at 359-360.

Petitioner exercised his Fifth Amendment right not to testify at the trial.  *Id.*, at 360.  His defense was that Mullin died by accidental, positional asphyxiation, during consensual intercourse, and that he panicked afterwards and hid the body and tried to hide her death.  *Id.*

### FACTS FROM PETITIONER'S NEW TRIAL MOTIONS

Petitioner's first new trial motion was denied without a hearing.  Supp. Ans., Ex. 1.  The materials and evidence presented as part of the new trial motion included, *inter alia*, a police report and two separate sets of notes made by the police stating that the sperm found on Mullin's body indicated that sex had taken place 24-36 hours before the death.  Supp. Ans., Ex. 4, pp. A30-A33.  The police report by Det. Sgt. Richard Craig stated:

> Last night, Trp. Berna had advised me that he'd learned from the State Police Laboratory that while the post mortem did not reveal that she'd been raped, it did reveal that she'd had sex approximately 36 hours or so before death, because there were small amounts of sperm deep inside her vagina.  The lab also confirmed small deposits of "old" sperm on her panties, which indicated she had changed her panties some time after her sexual encounter.  The lack of sperm, etc., on her body would be consistent with her having showered, as had been reported to us earlier.

Supp. Ans., Ex. 4, pp. A30-A31.  The other police notes read "Mary Lumley – old semen – (nite [sic] before, i.e., may have had sex Th — Or' Fri. afternoon)", Supp. Ans., Ex. 4, p. A32, and

"From Chemist Mary Lumley - sexual contact w/victim was approx. 24-30 hrs. prior to death (NOT LESS than 24 hrs.)."  Supp. Ans., Ex. 4, p. A33.  Mary Lumley[4] testified on direct examination that the age of the sperm could not be determined.  Tr. Volume 4, pp. 129-130.  No questions about the age of the sperm were raised on cross-examination.  *Id.*, pp. 147-155.  Post-trial, petitioner's trial counsel told petitioner's appellate counsel that he did not remember seeing that information or do any follow up on the issue.[5]  Supp. Ans., Ex. 4, pp. A38-A40, A82.

Petitioner's second new trial motion, alleging the failures of appellate counsel which constitute the fifth and sixth grounds of the instant petition, was also denied without a hearing. Supp. Ans. II, Ex. 9.  This motion did not allege any new facts, but rather asserted that appellate counsel failed to properly argue the facts in the appellate record.  In particular, the transcript of the trial demonstrates that one of the jurors was biased against the defendant, and appellate counsel should have argued that issue to the SJC.  Further facts relating to this claim are set forth *infra*, in Part III of the Argument.

## ARGUMENT

The standard for granting relief under 28 U.S.C. § 2254 is well established:

[F]ederal courts [may] grant habeas relief after a final state adjudication of a federal constitutional claim only if that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Pike v. Guarino*, 492 F.3d 61, 67 (1st Cir. 2007), *quoting* 28 U.S.C. § 2254(d).  Herein, petitioner

---

[4] At trial, she is identified by her married name, Mary McGilvrey.

[5] There is no allegation that the information was not produced to trial counsel in discovery.

7

will show that the state court's decisions were based on unreasonable applications of Federal law and unreasonable determinations regarding the facts of the case for multiple reasons.

**I.      Petitioner's Federal Constitutional Rights Were Violated in Multiple Ways by the Failure to Present the Jury with Evidence That the Sperm Found on the Decedent Pre-Dated Her Death by More than 24 Hours**

The prosecution's theory of the case was that petitioner raped Mullin after leaving the party with her, and then killed her to prevent her from reporting him. That theory critically depended on the sex between the two taking place after petitioner and Jewett left the party on January 30, 1993, within an hour or two of her death. If a sex act occurred prior to that, the facts that (a) Mullin happily accepted a ride home with petitioner on the night she was killed and (b) Mullin had an opportunity in the up to 24 hours between the sex act and her death to report any impropriety by petitioner but did not, imply that such an act was consensual. In the circumstances of this case, the amount and age of the sperm are consistent with a private, pre-existing, consensual sexual relationship between petitioner and Mullin before the party took place. Presenting the jury with evidence that any sex between the two had occurred many hours *before* the party could have strongly supported trial counsel's strategy.

The failure to present this evidence to the jury resulted in three separate violations of petitioner's constitutional rights: 1) his right to due process in the conduct of his trial under the Fifth and Fourteenth Amendments; 2) his right to counsel under the Sixth Amendment; and 3) his right to due process in the conduct of the Grand Jury that issued his indictment, in violation of the Fifth and Fourteenth Amendments. Each of these violations independently merits granting the petition, and jointly they require that the petitioner be given relief herein.

8

A.    *Violation of Petitioner's Right to Due Process*

The prosecutor is "the representative ... of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Kyles v. Whitley*, 514 U.S. 419, 439 (1995) (*citing Berger v. U.S.*, 295 U.S. 78, 88 (1935)). The justice system has a "twofold aim ... that guilt shall not escape [nor] innocence suffer." *United States v. Agurs*, 427 U.S. 97, 111 (1976), *Berger*, 295 U.S. at 88. A defendant's rights under the Fourteenth Amendment are violated where false evidence is known by the Government to have been presented in prosecuting a criminal case, whether the prosecutor actively elicits such evidence or simply allows such evidence to go uncorrected. *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (and cases cited therein).

By failing to acknowledge the existence of the sperm evidence, the prosecution violated Jewett's rights. The age of the sperm was clearly material, and because the prosecutor failed to disclose its age to the jury and created the impression that the sperm connected Jewett to the crime, the jury was left with an incomplete understanding of the material facts. This violated Jewett's federal due process rights and requires a new trial.

The prosecution's theory was that Jewett killed the decedent to cover up his alleged rape. The strongest evidence for the government was Jewett's alleged jail house confession to Mark Obershaw. At trial, the alleged confession was apparently corroborated by the sperm evidence. According to the prosecutor in his closing argument the sperm provided the key evidence to the case:

> Perhaps most important to this case is where his [Jewett's] sperm is located; inside
> the victim and inside her underwear in the crotch area. That, I submit to you holds
> the key to the whole case.

9

V.6, 48.[6]  The SJC's determination that all the Commonwealth did was fail "to impeach the testimony of the Commonwealth's own witnesses," *Jewett*, 442 Mass., at 363, was simply an unreasonable description of the Commonwealth's fraudulent presentation of the sperm evidence.

As the Commonwealth had reason to know, the apparent corroboration was false, and misled the jury into believing that a sexual encounter between Jewett and Mullin occurred on the night she died.  In fact, the sperm in question was only a small amount on Mullin's panties, which was 24-36 hours old at the time of her death, and some sperm found high up in her vagina which could have been up to a week old and was not clearly matched to Jewett.  This evidence actually indicated that Jewett and Mullin's sexual relations occurred a day or two before her death, and that Mullin had changed clothes and showered since then.

The only other physical evidence of a possible sexual assault tied to Jewett was evidence of a green thread found in Jewett's car.  This thread was identified as "consistent with" the thread from Mullin's shirt or from another shirt identical to hers.  There was no dispute, however, that Mullin rode home from the party in Jewett's car.  The presence of a thread from her shirt in the car was therefore neither surprising nor incriminating, and wholly consistent with Jewett's statements over the span of four years that he dropped her off at the end of her street so she could finish her beer.  The jump to an inference of a sexual assault that night by Jewett would be made all the more difficult if the jury knew or suspected that Jewett and Mullin had a prior, consensual encounter just a day or two earlier.

Indeed, evidence that Mullin's sexual encounter occurred prior to the party could have been used to support an entirely different trial strategy for petitioner, based on petitioner's

_____

[6] The prosecutor's claim that the sperm "inside" Mullin was a match to Jewett was also a misstatement of the evidence, as only the sperm on the panties was matched to petitioner.

statements to his friends and the police, that he dropped Mullin off, alive and healthy, a short distance from her house so that she could finish her beer before going home. Petitioner maintained that position for four years during the investigation of Mullin's death, and the only evidence suggesting he ever abandoned it was the alleged jailhouse confession. Trial counsel's strategy was needlessly inculpatory, attempting to explain the Commonwealth's improper and inaccurate evidence regarding the time of Mullin's sexual encounter. Had trial counsel properly examined the discovery, he could have developed a strategy based on refuting that evidence, instead. The SJC's determination that the sperm evidence was irrelevant to trial counsel's strategy, *Jewett*, 442 Mass., at 363, unreasonably ignored the fact that a different, and superior, strategy was available if trial counsel had been aware of the possibility of challenging the evidence.

Knowledge of the age of the sperm also casts doubt on the improper conclusion of sexual assault offered at trial by the medical examiners. *See infra*, Part II. Their opinion of sexual assault was based in substantial part on the false information about the age of the sperm. It was in the government's interest to avoid an inference from the physical evidence that Jewett and Mullin had a prior, consensual sexual relationship, since the existence of such a relationship would undermine its case as to both the rape and the murder charges.

In this case, the government avoided the inference of consensual sex through improper means. By artful juxtaposition of the fact that sperm found on Mullin's panties was Jewett's with other circumstantial evidence, and by intentionally ignoring information that the sperm was 24-36 hours old in violation of Jewett's due process rights, the prosecutor successfully, but falsely, created the impression that the sperm evidence corroborated his theory of the case. Because the prosecution's knowing use of false evidence was in violation of Jewett's rights, and the SJC's

determination otherwise was an unreasonable application of the facts to the law in this case, the petition must be allowed.

  B.  *Violation of Petitioner's Right to Counsel*

  Under the Sixth and Fourteenth Amendments to the United States Constitution, criminal defendants are entitled to adequate representation of counsel at trial. *Strickland v. Washington*, 466 U.S. 668, 685-686 (1984). In order to determine whether a constitutional error has occurred, the reviewing court must determine whether defendant has shown "that 'counsel's representation fell below an objective standard of reasonableness,' and that 'the deficient performance prejudiced his defense.'" *Owens v. United States*, 483 F.3d 48, 57 (1st Cir. 2007), *citing Strickland*, 466 U.S., at 687-688.

  In this case, the first element of the test is clear: Jewett's attorney did not even notice the information produced in pre-trial discovery relating to the age of the sperm. Supp. Ans., Ex. 4, pp. 38-40, 82. A failure to properly investigate the case pre-trial constitutes a violation of the first prong of the *Strickland* test. *Dugas v. Coplan*, 428 F.3d 317, 327-328 (1st Cir. 2005). A thorough review of the entire discovery in a case is a minimal requirement for proper investigation. Where there was no excuse for failure to notice the information regarding the sperm's age, this constitutes a failure of counsel to properly prepare for trial. Counsel had the information contained in the police reports. Either he failed to read them, or he read them and failed to recognize their importance, it makes no difference which: his failure to investigate this evidence falls "below an objective standard of reasonableness." As shown above, *supra* Part I, A., that failure prejudiced petitioner's defense.

  Another way of understanding what is meant by prejudicing petitioner's defense is to say

that "but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *Owens*, 483 F.3d, at 58.  In the present case, better work, work which saw and recognized the importance of the age of sperm evidence, would have allowed defense counsel to expose a central and fatal weakness in the prosecution's case.  Competent counsel would have cross examined the government's chemist about her alleged earlier statements to police.  Had the chemist disavowed these statements, defense counsel then could have brought the police officers who wrote the reports to testify as to their recollections regarding the statements they said the chemist once made.  If defense counsel's conduct had not fallen below an objective standard of reasonableness, the jurors would have been aware that the sperm evidence *discredited* the government's theory of rape, rather than *supporting* it, as the government successfully led them to believe.  As discussed *supra*, the SJC was unreasonable in determining that there was no prejudice based trial counsel's theory of the case, *Jewett*, 442 Mass., at 363, where trial counsel could and should have picked a different theory of the case if he had properly reviewed the discovery and realized the age of the sperm.

    C.    *The Presentation of the False Sperm Evidence to the Grand Jury Violated Defendant's Rights*

As the First Circuit has stated: "[a]lthough there is no constitutional requirement that States institute prosecutions by means of an indictment returned by a grand jury, that fact does not relieve those States that do employ grand juries from complying with the commands of the Fourteenth Amendment in the operation of those juries."  *Goodrich v. Hall*, 448 F.3d 45, 49 (1st Cir. 2005) (internal quotations omitted).  The prosecutor's duty of good faith extends to the proceedings before the grand jury.  *United States v. Basurto*, 497 F.2d 781, 786 (9th Cir. 1974). In *Basurto*, the prosecutor informed defense counsel of perjured testimony of a government

witness. *Basurto*, 497 F.2d at 784. At trial, the prosecutor informed the jury that there had been perjury at the grand jury. But the prosecutor never informed the grand jury, or the court during the grand jury proceedings, that a witness had perjured himself. And at trial, he attempted to minimize the impact of the perjury. *Id.* The court found this behavior did not "comport with [the] fastidious regard for the honor of the administration of justice," *Id.* (Internal quotes omitted), and ordered the conviction gained upon the impaired indictment overturned. Whenever any material falsehood is presented to the grand jury, the prosecutor is under a duty to disclose that falsehood to the grand jury. *Id.* at 785-786. If government misconduct at the grand jury is more prejudicial to the defendant than prosecutorial misconduct at trial, the relief for such misconduct should be no less than the relief offered for the same misconduct at trial. The *Agurs* standard requires that the findings of a trial jury be vacated if there is any reasonable likelihood that false testimony could have affected the jury. *Gilday v. Callahan*, 59 F.3rd 257, 267 (1st Cir. 1995) (*quoting Kyles*, 514 U.S. at 431); *see also Giglio v. United States*, 405 U.S. 150, 154 (1972). Although the standard for vacating a grand jury indictment is not as well defined, *Goodrich*, 448 F.3d, at 49, the indictment herein rises to the level of "grave doubt" that the decision to indict was free from substantial influence by the constitutional violations. *Id.*, at 50, *quoting Bank of Nova Scotia v. United States,* 487 U.S. 250, 256 (1998).

    Defendant contends that the impairment of the grand jury consists in the answers given to questions regarding the sperm found in Mullin's body. In response to a report regarding the findings of that DNA test, a grand juror asked Detective Richard Nagle "And the age of the sperm? Was it from that evening?" Detective Nagle responded: "I think that question may have to be directed to the individuals from the Lifecodes in regards to the age of the sperm." Supp.

Ans., Ex. 4, p. A102.  When the juror followed up by asking whether Lifecodes stated the age of the sperm in their findings, Detective Nagle answered: "They state whether or not that the sperm inside the victim... is consistent with the suspect, William Jewett."[7]  *Id.*  Where the grand jurors asked not one, but two, questions regarding the age of the sperm, the answers must have had a substantial influence on the decision to indict.

Furthermore, the answers were deliberately evasive and misleading.  Assuming Detective Nagle is not incompetent, he undoubtedly read the files provided to him by the officers he took the case from.[8]  And yet, when asked a direct questions by a juror, he gave an intentionally misleading answer.  He did so to secure an indictment against his only suspect, William Jewett. Nagle's deception did not "comport with [the] fastidious regard for the honor of the administration of justice."  *Basurto*, 497 F.2d at 784.  The Commonwealth did nothing to correct his response, either before the grand jury or at trial, and this deception requires dismissal of the indictment against Jewett.  *Contrast Goodrich*, 448 F.3d, at 50 (where petite jury was not infected by the false testimony, the conviction should not be overturned).

Indeed, if the age of the sperm evidence had been properly presented to the grand jury, there was no reasonably trustworthy information sufficient to believe Jewett had committed a crime.  The rest of the prosecutor's case before the grand jury was purely circumstantial, lacking whatever support the alleged jailhouse confession provided at trial.  None the evidence before

---

[7] Nagle's testimony also conflated the findings regarding the sperm located on the panties, which was matched to petitioner, with the sperm located in the vagina, which was not.

[8] The state court's denial of a hearing on the motion for new trial unreasonably prevented petitioner from confirming this conclusion.  Nagle testified to the grand jury that he investigated and reviewed the case for the District Attorney's office.  Supp. Ans. Ex. 4, p. A90.

the grand jury could place the defendant with the victim at the time of her death.  The most the prosecution could prove was that William Jewett was the last person known to have seen Mullin alive, and a car similar to defendant's was seen in the area where the body was found the next day.  Other than those two pieces of information, the Commonwealth's case at the grand jury was built entirely on inference and supposition held together by the DNA and the sperm evidence.  If Officer Nagle had testified truthfully regarding the age of the sperm before the grand jury, it would have told them only that Jewett may have had sex with Mullin some 24 to 36 hours prior to her death.  This would have told them nothing about how she died, and would have placed Jewett no closer to her in time at the moment of her death than he had already admitted to, which was when he dropped her off at the end of her street the night she died.  In order to indict, a grand jury must find probable cause to believe the defendant committed the alleged crime, based on true and accurate evidence.  *See, e.g. Gonzalez Rucci v. United States Immigration and Naturalization Service*, 405 F.3d 45, 49 (1st Cir. 2005).  Without the deception of Nagle, the grand jury would never have had probable cause and so would not have indicted William Jewett, and this case would never have made it to trial.

The SJC's finding to the contrary was manifestly unreasonable.  The SJC unreasonably asserted that petitioner had provided no evidence regarding whether Nagle knew about the documents, ignoring the fact that petitioner was prevented from developing that evidence by the failure of the trial court to hold an evidentiary hearing.  *Jewett*, 442 Mass., at 364.  It further unreasonably ignored the clear and repeated interest of the grand jury in the age of the sperm in asserting that a true answer to that question would not have swayed the grand jury.  *Id.*, at 364-365.  The petition must be allowed, and defendant's conviction reversed.

**II.    The Failure of Petitioner's Appellate Counsel to Claim a 6th Amendment Violation with Regards to the Improper Expert Testimony on Sexual Assault Violated Petitioner's Right to Counsel**

Petitioner raised in his initial brief to the SJC the question of whether the Commonwealth's expert testimony on sexual assault was improperly admitted as a matter of state law.  In a subsequent petition for rehearing, petitioner raised the issue of whether this failure also violated defendant's rights to counsel under the Sixth Amendment.  Appellate counsel's failure to raise this argument in the petitioner's initial brief to the SJC was an egregious violation of petitioner's right to counsel, as appellate counsel himself noted in the petition for rehearing, and the requested writ of habeas corpus must issue herein.

The Commonwealth presented two medical examiners who testified on direct examination that the victim had been sexually assaulted.  *Commonwealth v. Jewett*, 442 Mass., at 366-367.  This testimony was error, because it was not based on facts requiring a medical expert, but rather circumstantial evidence regarding the presence of semen and the disarray of the decedent's clothes.  *Id.*, at 367-368.

In its opinion, the SJC noted that trial counsel failed to object, and that the error was reviewed for either "a substantial risk of a miscarriage of justice" (regarding the rape) or "a substantial likelihood of a miscarriage of justice" (regarding the murder).  *Id.*, at 369.  In determining that this risk did not exist, the court asserted that the only motive for the alleged murder was the alleged rape, that the jury conviction of murder therefore showed that the jury believed the rape had occurred, and that the conviction of murder was not supported by the expert evidence on sexual assault.  *Id.*  These findings unreasonably and improperly relied on the murder conviction to uphold the rape conviction and vice versa, where in fact the improper

expert testimony undermined both verdicts.

The SJC unreasonably ignored the fact that, where the improper "expert" testimony regarding the alleged rape went directly to the Commonwealth's claimed motive for the alleged murder, it must have influenced the jury's determination on that count. In this case, where the defense theory at trial was accidental death during consensual sex, the jury would surely be influenced by the uncontradicted opinions of two experts that the sex was not consensual. Therefore, the wrongfully admitted expert opinions in this case were material to the murder charge and had the effect of bolstering the testimony of Obershaw, the witness to the alleged jailhouse confession. Using the fact that the jury determined there was a murder to find that the improper evidence of rape was harmless turns the reasoning and argument presented to the jury on its head, and was an unreasonable application of the law to the facts of this case.

As discussed in Part I B., *supra*, in order to prevail on a claim that his Sixth Amendment right to counsel was violated, petitioner must demonstrate that (1) "counsel's performance was deficient" and that (2) "the deficient performance [of counsel] prejudiced the defense." *Strickland v. Washington,* 466 U.S. 668, 687 (1984); *see also Kimmelman v. Morrison*, 477 U.S. 365 (1986); *Darden v. Wainwright*, 477 U.S. 168 (1986). If both of these elements are established by petitioner, it can be concluded "that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687.

There was no reason for appellate counsel to fail to raise a Sixth Amendment issue with regards to trial counsel's failure to object to this evidence, and the failure constituted a deficient performance by appellate counsel. Appellate counsel was already attacking the admissibility of the evidence, and the further grounds for showing error would have only been advantageous to

petitioner.  Indeed, appellate counsel himself suggested that his failure to argue this point in petitioner's initial brief to the SJC constituted ineffective assistance.  Supp. Ans. II., Ex. 11, letter from Attorney Miles Jacobson.

Furthermore, the failure prejudiced petitioner's defense.  Given trial counsel's strategy (admitting the killing, but claiming it was an accidental death during consensual sex), the fact that trial counsel failed to object to the expert testimony of sexual assault cannot reasonably be attributed to a strategic decision.  Rather, trial counsel's failure too was simply error.  Under federal constitutional law, failure to object may constitute ineffective assistance of counsel and lead to reversal.  See *Quartararo v. Fogg*, 679 F.Supp. 212, 240 (D.N.Y., 1988) (On habeas review, failure to object to evidence at trial was found incompetent).  In this case, as the SJC noted in its decision, *Jewett*, 442 Mass., at 367-368, state law is settled that the opinion evidence of sexual assault was improperly admitted.  That evidence was only harmful to the defense, and failure to object must be considered deficient.  Since the experts' testimony, contrary to the SJC's unreasonable determination otherwise, substantially enhanced the government's case, the deficient conduct prejudiced Jewett.  Without the expert testimony regarding the assault, the government's case was relatively weak, relying solely on the alleged jailhouse confession.  Accordingly, where petitioner has shown both deficient performance by counsel and prejudice, his Sixth Amendment rights were violated, and the petition must be granted.

### III.    Appellate Counsel Was Ineffective in Failing to Raise the Issue of Juror Bias

Petitioner's last claim is that his appellate counsel was ineffective in failing to raise the issue of juror bias over a juror who stated on the record "What if I say I automatically think he's guilty?"  Tr. 1, p. 100.  Trial counsel requested that the juror be removed for cause, and objected

to the trial judge retaining the juror as a member of the panel.  Tr. 1, pp. 102-103.  Appellate

counsel did not brief or argue the issue on appeal, and this was a violation of petitioner's Sixth

Amendment right to counsel.

As set forth *supra*, to prove petitioner's Sixth Amendment right to counsel was violated,

petitioner must demonstrate that (1) "counsel's performance was deficient" and that (2) "the

deficient performance [of counsel] prejudiced the defense."  *Strickland v. Washington,* 466 U.S.

668, 687 (1984).  Counsel's performance was deficient because presenting this issue would have

in no way weakened or limited petitioner's other issues.  Petitioner's brief was only 40 pages,

Supp. Ans., Ex. 3, well short of the 50 pages allowed under Mass.R.App.P. 16(h).  The juror

issue was separate from any of the others argued in the brief, and would in no way have

undermined those arguments.  Where counsel could have had neither space concerns nor worries

that this argument contradicted other arguments petitioner was making, counsel was deficient in

not presenting this argument to the SJC.

This failure also prejudiced the defense.  The Sixth Amendment guarantees petitioner a

fair and unbiased jury.  *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000); *see also*

*Morgan v. Illinois*, 504 U.S. 719 (1992).  The First Circuit has described the right to a jury as

part of the "fundamental triumvirate of procedural protections" in criminal cases, along with fair

notice and proof beyond a reasonable doubt.  *United States v. Matthews*, 498 F.3d 25, 34 (1st Cir.

2007), *quoting United States v. Tighe*, 266 F.3d 1187 (9th Cir. 2001).  The First Circuit has held

that the jury right is so significant that normal procedural waivers do not apply to it, requiring

the agreement of the court before it can be forfeited.  *United States v. Leja*, 448 F.3d 86, 92 (1st

Cir. 2006).

20

Herein, the trial court unreasonably violated petitioner's right by its refusal to remove the juror once she demonstrated that she was willing to make unfounded assertions regarding petitioner's guilt in order to be removed from the panel.  The juror had conclusively demonstrated that she lacked the temperament to fairly and honestly evaluate the facts of the case, and she should have been discharged.  *See, e.g. United States v. Bornfiled*, 145 F.3d 1123, 1132-33 (10th Cir. 1998) (juror misconduct of expressing impatience with length of trial appropriately corrected by juror's dismissal as alternate at end of trial and instructions to jury). The trial court was unreasonable not to dismiss the juror where defendant's counsel objected to her, and the SJC was unreasonable in upholding that decision on defendant's motion for new trial.

## CONCLUSION

For all the above reasons, including the inaccurate and untrue evidence presented to both the grand and petite juries regarding the age of the sperm herein, the illegal expert opinion evidence, and the improper retention of a biased juror, the petition must be allowed, and the writ of habeas corpus must issue.

**PETITIONER REQUESTS A HEARING ON THIS ISSUE.**

WILLIAM JEWETT, JR.
By his attorney,

/s/  *John H. Cunha Jr.*

John H. Cunha Jr.
B.B.O. No. 108580
CUNHA & HOLCOMB, P.C.
One State Street, Suite 500
Boston, MA 02109-3507
617-523-4300

Dated: December 21, 2007                    H:\Word\Crim\Jewett\Memo Support Habe.wpd

21

<u>CERTIFICATE OF SERVICE</u>

     I certify that a copy of the foregoing document was served via electronic filing upon AAG Eva M. Badway, Attorney General's Office, One Ashburton Place, Boston, MA 02108-1698.

                              /s/ *John H. Cunha Jr.*
                              John H. Cunha Jr.