UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| WILLIAM JEWETT, JR., | ) | |
| Petitioner | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-11849-GAO |
| | ) | |
| BERNARD BRADY, | ) | |
| Respondent | ) | |

**PETITIONER'S MOTION FOR FURTHER DISCOVERY**

Petitioner, William Jewett, Jr., moves this Court pursuant to Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts, to allow additional depositions in this case, to wit, the depositions of State Trooper Berna and Officer Mike Milligan, formerly of the Weymouth Police Department. In support whereof, petitioner states as follows:

Several of the legal issues presented in his petition revolve around the question of the age of the sperm found in the deceased. Police notes and reports indicate that prior to trial, the State Police Crime Laboratory ("Crime Lab") chemist, Mary McGilvray (then Lumley), stated that, contrary to the Commonwealth's theory at trial, the sperm was too old to have been left by an assault contemporaneous with the death. At trial, however, she testified that the age of the sperm could not be determined. Defense counsel did not cross-examine on that point. At hearing on April 2, 2008, this Court allowed discovery constituting depositions of Ms. McGilvray, petitioner's trial counsel, and Detective Sergeant Richard Craig of the Rockland Police Department. At that hearing (and in defendant's prior filing, Petitioner's Motion for Discovery), petitioner reserved the right to request the deposition of further police officers if necessary. At this time, depositions of Ms. McGilvray and of trial counsel have been taken. Detective Sergeant

Craig's deposition is scheduled for this Friday, June 27, 2008.

In her deposition, Ms. McGilvray stated that she did not believe she would have stated a specific age for the sperm, but suggested that it was possible that Trooper Berna spoke to someone else in the Crime Lab. June 3, 2008 Deposition of Mary McGilvray, pp. 55-56.[1] She did not have any specific recollection of discussing this case with Trooper Berna at all. *Id.* The notes regarding Trooper Berna's conversation are very specific, stating that the state police laboratory postmortem "did not reveal that [the victim] had been raped, [but] did reveeal that she had sex approximately 36 hours or so before death." *Id.* It is in the interests of justice to allow further discovery to depose Trooper Berna and discover where he received this information.

With respect to Officer Milligan, Ms. McGilvray did not know anyone of that name and could not recall speaking with him about this case. Deposition of Mary McGilvray, p. 46. Officer Milligan's notes were similarly specific, stating that "sexual contact with victim was approximately 24 to 30 hours prior to death, not less than 24 hours." *Id.* Ms. McGilvray confirmed that these notes were accurate regarding other details included in the notes, such as the inability to non-destructively blood type the semen, but denied that they were accurate regarding the age of the sperm, and could not explain where the information might have come from. *Id.*, pp. 47-52. It is in the interests of justice to allow further discover to depose Officer Milligan and

---

[1] Cited portions of the deposition are attached hereto as Exhibit 1.

determine where he received this information.

> WILLIAM JEWETT, JR.
> By his attorney,
>
> /s/ *John H. Cunha Jr.*
> John H. Cunha Jr.
> B.B.O. No. 108580
> CUNHA & HOLCOMB, P.C.
> One State Street, Suite 500
> Boston, MA 02109-3507
> 617-523-4300

Dated: June 25, 2008                                  H:\Word\Crim\Jewett\motion for further discovery.wpd

CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was served via electronic filing upon AAG Eva M. Badway, Attorney General's Office, One Ashburton Place, Boston, MA 02108-1698.

> /s/ *John H. Cunha Jr.*
> John H. Cunha Jr.

1

1   Volume I

2   Pages 1 to 67

3   Exhibits 1 to 5

4   UNITED STATES DISTRICT COURT

5   DISTRICT OF MASSACHUSETTS

6

7   C.A. No. 05-11649-GAO

8   - - - - - - - - - - - - - - - - - x

9   WILLIAM JEWETT, JR.,                  :

10         Petitioner,                    :

11                                        :

12         vs.                            :

13                                        :

14   BERNARD BRADY,                       :

15         Respondent.                    :

16   - - - - - - - - - - - - - - - - - x

17   DEPOSITION OF MARY McGILVRAY

18   Tuesday, June 3, 2008

19   9:57 a.m. to 11:35 a.m.

20   Cunha & Holcomb, P.C.

21   One State Street, Suite 500

22   Boston, MA 02109-3507

23

24   Reporter: Kathleen M. Madden, CSR

Mary McGilvray

45

1  Q. Let us show you Exhibit 4 and 5. Are those
2  also some of the documents that you reviewed?
3  A. Yes.
4  Q. Other than Exhibits 3, 4, and 5, and
5  Exhibits 1 and 2, were there any other documents
6  that you reviewed in preparation for your testimony
7  here today?
8  A. No. Just these.
9  Q. And they were provided by you counsel?
10 A. Yes -- no, I'm sorry there was a portion of
11 a transcript, a portion of my transcript.
12 Q. From the trial?
13 A. Yes.
14 Q. So including that portion of the transcript
15 as well as Exhibits 1 through 5, is there anything
16 else that you reviewed prior to today's deposition?
17 A. No.
18              FURTHER DIRECT EXAMINATION
19 BY MR. HOPE:
20 Q. So looking at Exhibit 3, you are familiar
21 with this document?
22 A. Yes.
23 Q. You didn't prepare this document?
24 A. No, this is not my document.

46

1   Q.   It's marked into three sections.  Drawing
2 your attention to the central section, it appears to
3 be notes of an Officer Mike Milligan.  Do you
4 recognize that name at all?
5   A.   I do not.
6   Q.   But you said that you may have conversations
7 with officers about cases that you may not
8 personally know?
9   A.   Yes.
10   Q.   And reading as best -- well, why don't you
11 see what you think that says.  Can you read that as
12 best you can?
13   A.   I don't know what the first part says, but
14 the next word is, "Chemist, Mary Lumley, sexual
15 contact with victim was approximately 24 to 30 hours
16 prior to death, not less than 24 hours.  Blood
17 typing of semen sample is not possible due to size
18 and lack of certainly chemical properties.  To
19 attempt such a test would result in destruction of
20 the sample.  It is however DNA viable should we want
21 to do that."
22   Q.   Do you have any recollection of having such
23 a conversation with an officer?
24   A.   No.

Mary McGilvray

47

1   Q. Do you have any recollection of having
2   conversations with officers about this case?
3   A. The only conversation I remember is as we
4   prepared for trial. I don't have a specific memory
5   of any conversations prior to that.
6           FURTHER DIRECT EXAMINATION
7   BY MR. CUNHA:
8   Q. With respect to the information that is in
9   this note, for instance, it says, "Blood typing and
10  semen sample is not possible due to the size and
11  lack of certain chemical properties," is that
12  accurate?
13  A. It would be destructive, yes, in totality --
14  Q. I hadn't finished reading it, but it says,
15  Lack of certain chemical properties to attempt such
16  a trial would result in destruction of the sample.
17  Is that accurate?
18  A. The part about the chemical properties is
19  not accurate. The part blood typing of the semen
20  sample, I would say would not be recommended due to
21  the fact that it would destroy the sample. That
22  would be an accurate statement.
23  Q. It is accurate, also, the next sentence that
24  says "It is DNA viable" --

Mary McGilvray

48

1    MS. BADWAY: Excuse me. She didn't say
2  it was accurate. You said it is also accurate.
3    Q. With respect to the next sentence, which
4  says "DNA viable should we want to do that," is that
5  accurate?
6    A. Yes.
7    Q. In fact, DNA testing was done on this
8  sample?
9    A. Yes.
10   Q. With respect to the information that's
11 contained in the first part, that is, "Sexual
12 contact with the victim was approximately 24 to 30
13 hours prior to death, not less than 24 hours," is
14 that accurate?
15   A. Not in my opinion.
16   Q. Do you have any information as to where that
17 information came from? You will agree that it seems
18 to say "FM, from chemist Mary Lumley"?
19   A. I can't really make out that first part, but
20 it does seem to be a note indicating --
21   Q. A conversation with you?
22   A. Or information about me or from me.
23   Q. With respect to the information contained in
24 this first sentence, again, do you have any idea why

Mary McGilvray

49

1  an officer would write that as coming from you, that
2  information as coming from you?
3       A.  I do not know why a person would write those
4  notes in his notes.
5       Q.  Have you ever provided such information in
6  any case?
7       A.  I've never provided information like that in
8  a definitive way, absolutely not.
9       Q.  What do you mean by a "definitive way"?
10      A.  Oftentimes, as a scientist, I do engage in
11 discussions with people about the longevity of sperm
12 or how long you might expect to find sperm in a
13 vaginal cavity after an event happens, those are in
14 no way intended to be interpreted as a definitive
15 result in a case.  This is information that's out
16 there in the literature that somebody could
17 reference if they wanted to see how long sperm could
18 be detected in the vaginal cavity.
19      Q.  When you say "in the literature," what
20 literature are you referring to?
21      A.  There are scientific journals that publish
22 research about those sorts of things.  I don't know
23 offhand the name of one that would have this sort of
24 information in it; however, a common forensic

50

1  journal is a journal of forensic science.

2  Q. Did you consult any such journals prior to
3  your testimony today?

4  A. No.

5  Q. Do you recall if you consulted any such
6  journals prior to or around the time of your
7  examination of the vaginal swabs and smears in this
8  case, that is in 1993?

9  A. No, I wouldn't have consulted journals in
10 relation to this case, no.

11 Q. So do I understand your testimony to be that
12 in speaking to an officer, you might say that
13 something is consistent with a certain time period
14 but it is not scientifically definitive?

15 A. No, absolutely not, absolutely not correct.

16 Q. So if this were to be attributed to you by
17 him -- I'm asking you to assume that -- he would
18 have had to have made up that first sentence?

19 A. No. He would have had to taken information
20 out of context and interpreted it in his own way to
21 put in his own notations for his own use. It
22 wouldn't have been a result from me, because my
23 results are contained in that report that comes from
24 the laboratory. So I can't explain why somebody

Mary McGilvray

51

1  would write something in their notes as being
2  factual.  But I can say, as a scientist, I do try to
3  discuss scientific information with laypeople who
4  might not understand everything that I'm trying to
5  say and what's factual and what's just theoretical.
6      Q.  You will agree with me that the information
7  in that first paragraph is pretty specific.  That
8  is, that there is a time limit of a six-hour span,
9  that is 24 to 30 hours prior to death?
10     A.  That is very specific, yes.
11     Q.  And not less than 24 hours is even more
12 specific?
13     A.  That's correct.
14     Q.  Can you tell us what the context would be
15 for such specificity --
16         MS. BADWAY:  She can't surmise.
17         MR. CUNHA:  I'm asking the question, and
18 she can answer however she wishes.  Whatever
19 evidentiary value it has is up to the judge.
20     Q.  Can you tell us what is the context by which
21 information you give would have such specificity?
22     A.  I can't, because I wouldn't give such
23 specific information.  There is no way I can
24 scientifically give such a specific answer related

Mary McGilvray

52

1  to any piece of evidence. That would be impossible
2  for me to do.
3      Q.  So, assuming, again, that this is a note
4  from the officer relating in conversation with you,
5  with respect to the specificity, that is the 24 to
6  30 hours and the not less than 24 hours, that would
7  have had to have been made up by him?
8      A.  Conversations go two ways, so I'm telling
9  you I did not provide that information with such
10 specificity to be placed in a note like that.
11 Absolutely not.
12     Q.  I understand what you're saying. What I'm
13 trying to determine is, what context could there be
14 that would have such numbers that would be
15 misinterpreted or -- if he didn't make it up, what
16 is the context in which that could appear in a
17 conversation with you whether it's misunderstood or
18 not?
19     A.  If you ask me a question, a very specific
20 question and I answer you, there's a possibility
21 that you don't hear my answer. All you hear is your
22 question. I don't know if that happened in this
23 situation. I can't say why he wrote that down.
24 That's not my answer. That might have been his

Mary McGilvray

55

1  case?

2  A. No.

3  FURTHER DIRECT EXAMINATION

4  BY MR. HOPE:

5  Q. Moving on to Exhibit 5. This is something
6  you reviewed prior to this deposition. If I can
7  draw your attention to the starred paragraph at the
8  bottom of Page 1 of this two-page exhibit and then
9  continuing on to the second page. Can you just read
10 that paragraph for us.

11 A. Yes. "Last night Trooper Berna had advised
12 me that he learned the state police laboratory that
13 while the postmortem did not reveal that she had
14 been raped, it did reveal that she had sex
15 approximately 36 hours or so before death because
16 there were small amounts of sperm deep inside her
17 vagina. The lab also confirmed small deposits of,
18 quote/underquote, old sperm on her panties which
19 indicated she had changed her panties sometime after
20 her sexual encounter. The lack of sperm, et cetera,
21 on her body would be consistent with her having
22 showered as had been reported to us earlier."

23 Q. Would the -- the state police laboratory is
24 where you work, correct?

56

1   A.   That's correct.

2   Q.   Would there have been anyone else at the
3   state police laboratory working on this case that
4   the trooper might have spoken with?

5   A.   I don't know.  I was the only one working on
6   the case, but I don't know if he would have spoken
7   to anybody else about the case.

8                FURTHER DIRECT EXAMINATION
9   BY MR. CUNHA:

10   Q.   Do you know Trooper Berna?

11   A.   Yes, I know him.  I don't know him now.  I
12   wouldn't recognize him if I saw him now, but I had
13   met him back at the time of this case, yes.

14                FURTHER DIRECT EXAMINATION
15   BY MR. HOPE:

16   Q.   Do you have any recollection of having a
17   conversation with him about this case?

18   A.   No specific recollection, no.

19   Q.   Again, just briefly, we've only spoken so
20   far about the sperm collected from the hospital
21   specimen kit in this case, correct?

22   A.   That's correct.

23   Q.   There was actually a second site from which
24   sperm was located, correct, from the panties?