## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **WILLIAM JEWETT, JR.,**<br>Petitioner<br><br>v.<br><br>**BERNARD BRADY,**<br>Respondent | )<br>)<br>)<br>)<br>)    Civil Action No. 05-11849-GAO<br>)<br>)<br>)<br>)<br>)<br>) |

## PETITIONER'S SUPPLEMENTAL BRIEFING BASED ON DISCOVERY TO DATE

### I.    INTRODUCTION

Pursuant to the Court's order, petitioner, William Jewett, Jr., hereby files this supplement, based on the discovery which has been conducted to date, to his previously filed Petitioner's Memorandum in Support of Petition for *Habeas Corpus* Relief ("Prior Memorandum"), incorporated herein by reference.[1]  As set forth in the Prior Memorandum, defendant's petition raises six grounds on which habeas relief should be granted.  Three of those grounds involve the sperm evidence presented at petitioner's trial.  Petitioner was allowed by this Court to take depositions of three witnesses regarding the sperm evidence: State Police Crime Laboratory ("Crime Lab") chemist, Mary McGilvray (Mary Lumley at the time of the underlying trial herein), Detective Sergeant Richard Craig of the Rockland Police Department (retired), and Attorney Robert L. Jubinville, petitioner's attorney at the underlying trial.[2]   The information

---

[1] Petitioner does not waive any issues or arguments presented in his Prior Memorandum, whether or not those issues or arguments are discussed herein.

[2] Petitioner has moved for two additional depositions in this case, to wit, the depositions of State Trooper Berna and Officer Mike Milligan, formerly of the Weymouth Police Department. Petitioner's motion on this issue is still pending before the Court.

developed in those depositions supports granting the petition.

These three legal issues revolve around the age of the sperm found in the deceased's body and clothes.  At trial, the Commonwealth proceeded on the theory that the petitioner raped the deceased after they left a party together, and then killed her shortly thereafter.  However, police notes and reports indicate that prior to trial, Ms. McGilvray stated that, contrary to her trial testimony and to the Commonwealth's theory at trial, the sperm was too old to have been left by an assault contemporaneous with the death.  At trial she testified that the age of the sperm could not be determined.  Defense counsel did not cross-examine on that point.[3]

## II.     FACTS DEVELOPED IN DISCOVERY

Two of the police reports that state the sperm significantly pre-dated the time of death were prepared by Detective Craig.  June 27, 2008 Deposition of Richard Craig, pp. 8, 11.[4] Detective Craig's typed report specifically states that he was told by Trooper Scott Berna that the state police laboratory postmortem "did not reveal that [the victim] had been raped, [but] did reveal that she had sex approximately 36 hours or so before death."  *Id.*, at 6-8, and Exhibit 5.  It further states that the age of the sperm in her panties "indicated she had changed her panties some time after her sexual encounter," and that the body was consistent with her having showered after the encounter.  *Id.*, at 7.  Detective Craig testified that he had no independent recollection of the conversation with Trooper Berna, but that the report was a true and accurate memorialization of

---

[3] At his deposition, Attorney Jubinville stated he did not recall reviewing the three police reports prior to trial.  June 4, 2008 Deposition of Robert L. Jubinville, p. 7.  He further stated that he did not recall whether he made a deliberate strategic decision not to raise the age of the sperm as an issue at trial.  *Id.*, p. 9.  The deposition of Attorney Jubinville is attached hereto as Exhibit 1.

[4] Cited portions of the deposition of Detective Craig are attached hereto as Exhibit 2. Detective Craig's deposition used the same exhibits as Ms. McGilvray's deposition.

the conversation.  *Id.*, at 8.  Detective Craig also testified that handwritten notes stating "10:34 a.m. Mary Lumley – Old semen – Night before,  may have had sex Th[ursday] or Fri[day] afternoon" were in his handwriting.  *Id.*, at 11 and Exhibit 4.  Detective Craig could not recall if he made those notes directly from a conversation with Ms. McGilvray.  *Id.*, at 12.  He believed it might be notes from a conversation with Trooper Berna, but was not certain of that.  *Id.*, at 13.  He confirmed that the notes meant that he had been told that the semen was from the night before the death.  *Id.*, at 14.  Detective Craig was unable to identify the third report mentioning the age of the sperm, although he recognized the officer named therein, Mike Milligan, as a Weymouth police officer who worked on this case.[5]  *Id.*, at 9-10.  Detective Craig stated that he was informed by the Assistant District Attorney on the case not to believe the information he had received about the age of the sperm.  *Id.*, at 14.

Ms. McGilvray stated that she could not recall the conversation or conversations which resulted in Detective Craig's notes and report.  June 3, 2008 Deposition of Mary McGilvray, pp. 53-56.[6]  She did not believe she would have stated a specific age for the sperm, but suggested that it was possible that Trooper Berna spoke to someone else in the Crime Lab.  *Id.*  She did not have any specific recollection of discussing this case with Trooper Berna at all.  *Id.*  She stated that the description of the sperm as "old" in Detective Craig's handwritten notes was one that would be a common interpretation of her description of the sperm.  *Id.*

With respect to the third set of notes, apparently prepared by Officer Milligan, Ms. McGilvray did not know anyone of that name and could not recall speaking with him about this

---

[5] As noted *supra*, note 2, petitioner's motion to depose Trooper Berna and Officer Milligan is pending before the Court.

[6] Cited portions of the deposition of Ms. McGilvray are attached hereto as Exhibit 3.

case. *Id.*, at 46. Officer Milligan's notes were similarly specific that the sperm was deposited prior to death, stating that "sexual contact with victim was approximately 24 to 30 hours prior to death, not less than 24 hours." *Id.* Ms. McGilvray confirmed that these notes were accurate regarding other details included in the notes, such as the inability to non-destructively blood type the semen, but denied that she would have described the age of the sperm in the language used, and could not explain why such specific language would be contained in the notes. *Id.*, pp. 47-52. She stated that she could have discussed the longevity of the sperm, but did not believe she would have used such definitive language. *Id.*

## III.    APPLICATION TO PETITIONER'S LEGAL ARGUMENT

As set forth in the Prior Memorandum, pp. 8-16, incorporated herein by reference, the failure to present the conflicting evidence regarding the age of the sperm herein resulted in violations of three separate constitutional rights guaranteed to petitioner: 1) his right to due process in the conduct of his trial under the Fifth and Fourteenth Amendments; 2) his right to counsel under the Sixth Amendment; and 3) his right to due process in the conduct of the Grand Jury that issued his indictment under the Fifth and Fourteenth Amendments. The discovery herein confirms that:

1.    There was no strategic reason for failing to bring this evidence out at trial;

2.    There was significant evidence which could have been, but was not, presented at trial to undercut the Commonwealth's version of the facts; and

3.    The police were informed that the information regarding the age of the sperm was not to be considered reliable by the ADA on the case, rather than by any kind of scientific expert.

These facts, in combination with the clear exculpatory nature of the age of the sperm and the

4

arguments already presented to the Court herein, conclusively demonstrate that petitioner's

constitutional rights were violated at his trial, and the petition must be granted.

WILLIAM JEWETT, JR.
By his attorney,

/s/   *John H. Cunha Jr.*

John H. Cunha Jr.
B.B.O. No. 108580
CUNHA & HOLCOMB, P.C.
One State Street, Suite 500
Boston, MA 02109-3507
617-523-4300

Dated: August 6, 2008                                     H:\Word\Crim\Jewett\supplemental briefing.wpd

<u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing document was served via electronic filing upon
AAG Eva M. Badway, Attorney General's Office, One Ashburton Place, Boston, MA 02108-
1698.

/s/   *John H. Cunha Jr.*

John H. Cunha Jr.

1                                                    1

1                                   Volume I

2                                   Pages 1 to 11

3                                   Exhibits 1 to 5

4                 UNITED STATES DISTRICT COURT

5                 DISTRICT OF MASSACHUSETTS

6

7                             C.A. No. 05-11849-GAO

8    - - - - - - - - - - - - - - - - - - - x

9    WILLIAM JEWETT, JR.,                  :

10             Petitioner,                 :

11                                         :

12         vs.                             :

13                                         :

14   BERNARD BRADY,                        :

15             Respondent.                 :

16   - - - - - - - - - - - - - - - - - - - x

17         DEPOSITION OF ROBERT L. JUBINVILLE

18             Wednesday, June 4, 2008

19             2:04 p.m. to 2:14 p.m.

20             Cunha & Holcomb, P.C.

21         One State Street, Suite 500

22             Boston, MA 02109-3507

23

24      Reporter:  Kathleen M. Madden, CSR

Robert L. Jubinville

2

1   A P P E A R A N C E S:

2

3   CUNHA & HOLCOMB, P.C.

4   By John H. Cunha, Jr., Esq., and

5   Charles Allan Hope, Esq.

6   One State Street, Suite 500

7   Boston, MA 02109-3507

8   617-523-4300

9   On behalf of the Petitioner

10

11   COMMONWEALTH OF MASSACHUSETTS

12   OFFICE OF THE ATTORNEY GENERAL

13   By Eva M. Badway, Esq.

14   One Ashburton Place

15   Boston, MA 02108

16   617-727-2200 Ext. 2824

17   On behalf of the Respondent

18

19

20

21

22

23

24

Robert L. Jubinville

3

1                         I N D E X

2

3    EXAMINATION OF:

4    ROBERT L. JUBINVILLE

5

6                         DIRECT

7        By Mr. Hope              4

8

9                    *  *  *  *  *

10

11                    E X H I B I T S

12   NO.                                      PAGE

13   1      Document entitled "Affidavit of

14          Myles Jacobson"                   5

15   2      Document entitled "Sworn Statement of

16          Michael J. Fellows"              5

17   3      Handwritten notes                5

18   4      Handwritten notes with timeline  5

19   5      Document entitled "Homicide

20          Investigation"                   5

21

22

23        (Exhibits retained by Attorney Cunha)

24

Robert L. Jubinville

4

1                    P R O C E E D I N G S

2                        Stipulation

3        It is stipulated by and between counsel for the

4    respective parties that the deposition is to be read

5    and signed under the pains and penalties of perjury;

6    and that all objections, except as to form, and

7    motions to strike are reserved to the time of trial.

8                           ____

9

10                   ROBERT L. JUBINVILLE

11   a witness called for examination by counsel for the

12   Petitioner, having first been satisfactorily

13   identified and duly sworn by the Notary Public, was

14   examined and testified as follows:

15                   DIRECT EXAMINATION

16       BY MR. HOPE:

17       Q.  Can you, please, state your name for the

18   record?

19       A.  Robert Jubinville.

20       Q.  What do you do?

21       A.  I'm a criminal defense lawyer.

22       Q.  How long have you been doing that?

23       A.  This is my 30th year.

24       Q.  Did you represent the Petitioner in this

Robert L. Jubinville

5

1   case, William Jewett?

2       A.  I did.

3       Q.  You were the second trial lawyer in this

4   case; is that correct?

5       A.  I don't know that.  I think I was the

6   first -- did he have another lawyer before that?

7       Q.  I don't think it's actually relevant to any

8   of the stuff we're getting into, but you handled the

9   actual trial in the case?

10      A.  I did.

11      Q.  And you handled the discovery and pretrial

12  proceedings, to the best of your recollection?

13      A.  I did, yes.

14      Q.  In preparation for this deposition, you've

15  reviewed some documents that we provided you with?

16      A.  Yes, I have documents.

17              (Documents marked as Jubinville

18              Exhibits 1 through 5 for identification)

19      Q.  I'm now going to show you briefly the

20  documents that have been marked Exhibits 1 through 5

21  and see if you reviewed all of those in preparing

22  for this deposition.

23      A.  (Witness reviews document) Yes, I have

24  reviewed them.

Robert L. Jubinville

6

1    Q.  In addition, we provided you with the trial

2    transcript of the testimony of Mary McGilvray.  Have

3    you had a chance to review --

4    A.  I did.

5    Q.  In that transcript, Ms. McGilvray talks

6    about sperm -- let's back up.  Do you have a

7    recollection of the general facts of the underlying

8    case?

9    A.  From reading this, I can see what it says.

10    MR. CUNHA:  This being the transcript?

11    A.  The transcript, Exhibit --

12    Q.  We haven't marked the transcript yet.

13    MR. CUNHA:  It's the transcript of the

14    testimony from McGilvray from the trial dated

15    November 19, 1998.

16    FURTHER DIRECT EXAMINATION

17    BY MR. CUNHA:

18    Q.  In the course of reviewing discovery, do you

19    recall reviewing the matters that or the documents

20    that have been marked Exhibits 3, 4, and 5 in this

21    deposition?

22    A.  Yes.

23    Q.  You recall those?

24    A.  You sent me those and I reviewed them.

Robert L. Jubinville

7

1    Q.  Do you recall at the time of your -- first

2  of all, were you appointed by CPCS or were you

3  retained?

4    A.  I think I was a retain.

5    Q.  Prior to trial, do you recall reviewing

6  these three documents, again marked Exhibits 3, 4,

7  and 5?

8    A.  I don't have a memory of that.

9    Q.  Is it fair to say then -- well, you don't

10  have a memory of the document.  Do you have a memory

11  of any potential issue arising from a description of

12  the sperm as being old?

13    A.  I don't have a memory of that as I sit here

14  today one way or the other.  I'm not saying I didn't

15  receive and review these.  I don't recollect.

16    Q.  With respect to the Exhibit 1, which is the

17  affidavit of Myles Jacobson, reference is made in

18  here on the second page of the affidavit in

19  Paragraph 3 in a conversation he had with you on

20  April 9, 2002.  That is memorialized in pertinent

21  part in a letter dated April 10, 2002, which is

22  attached to the affidavit.  As I understand, you had

23  a chance to review both of those prior to today's

24  deposition?

Robert L. Jubinville

8

1    A.   Yes.

2    Q.   Do you recall a conversation with Attorney

3 Jacobson?

4    A.   No.  I recall a conversation with him.  I

5 don't recall specifically what it is.

6    Q.   Is it fair to say, however, that with

7 respect your memory of the matter that we just asked

8 you about, that is whether there was, quote/unquote,

9 old sperm, at least as far as the affidavit is

10 concerned in a letter written to you on April 10,

11 2002, according to Attorney Jacobson, you said at

12 that time you had no memory as well?

13    A.   Right.

14    Q.   Do you have any recollection as to, at this

15 point, whether you had no memory at the time, just

16 as you have no memory now?

17    A.   No, I don't.  I don't have -- I didn't have

18 a memory then or now.

19    Q.   So that would be the same with respect to

20 the affidavit of Michael J. Fellows, which is marked

21 as Exhibit 2, in which he again refers to a

22 telephone conversation with you on April 10, 2002?

23    A.   Right.

24    Q.   So you don't recall anything about this as a

Robert L. Jubinville

9

1    potential issue?

2        A.  I don't, other than what I'm reading here.

3    And you can ask me from it.  But do I have a memory

4    of it from back then?  No, I don't.

5        Q.  So not having a memory of it, you don't know

6    what, if anything, you may or may not have reviewed

7    prior to trial?

8        A.  I have no memory at all.

9        Q.  You have no memory therefore of whether or

10   not you determined prior to trial to use or not use

11   any such information as a matter of strategy?

12       A.  No, I wouldn't remember that.

13               MR. CUNHA:  I have no further questions.

14               MS. BADWAY:  I have no questions.

15               (Whereupon, the deposition was

16               concluded at 2:14 p.m.)

17

18

19

20

21

22

23

24

Richard Craig

1

1               UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
2

    WILLIAM JEWETT, JR.,
3

                   Petitioner,
4                                        Civil Action
    VS.                                  No. 05-11849-GAO
5

    BERNARD BRADY,
6

                   Respondent.
7

8

9   DEPOSITION OF:      RICHARD CRAIG
10  DATE:               June 27, 2008
11  TIME:               2:00 p.m.
12  LOCATION:           Offices of
                        Federal Defender's Office
13                      501 E. McBee Avenue
                        Greenville, SC  29601
14
    TAKEN BY:           Counsel for the Petitioner
15
16  REPORTED BY:        MICHELE E. BECKER,
                        Registered Professional Reporter
17

18
19
20
21
22
23
24
25

Richard Craig

```
 2
 1  APPEARANCES OF COUNSEL:
 2          ATTORNEY FOR THE PETITIONER
                 WILLIAM JEWETT, JR.
 3
                    CUNHA & HOLCOMB, P.C.
 4                  BY: CHARLES ALLAN HOPE
                    One State Street, Suite 500
 5                  Boston, MA  02109-3507
                    (617) 523-4300
 6                  hope@cunhaholcomb.com
 7
 8          ATTORNEY FOR THE RESPONDENT
                 BERNARD BRADY
 9
                    THE COMMONWEALTH OF MASSACHUSETTS
10                  OFFICE OF THE ATTORNEY GENERAL
                    CRIMINAL BUREAU
11                  ASSISTANT ATTORNEY GENERAL
                    BY: EVA M. BADWAY
12                  One Ashburton Place
                    Boston, MA  02109
13                  (617) 727-2200
                    eva_badway@ago.state.ma.us
14
15
16
17
18
19
20
21
22
23
24
25
```

Richard Craig

6

1        Q    State Police Crime Lab came to the

2  scene and did the searching for hairs and all that

3  sort of investigation?

4        A    Yes, sir. I believe the Coroner's

5  Office also came.

6        Q    Do you recall who from either the

7  Crime Lab or the Coroner's Office was there?

8        A    I honestly cannot recall, sir.

9        Q    All right. But you were there

10  throughout the process as well?

11        A    Yes, sir.

12        Q    Okay. At some point once the

13  investigation had begun, did you have further

14  contact with the Crime Lab to determine what they

15  learned from their investigation?

16        A    No, I did not, sir.

17        Q    Do you know -- did you at any point

18  receive information from other parties who had had

19  discussions with the crime lab?

20        A    Yes, sir.

21        Q    Okay. Do you recall who that was?

22        A    I believe it was Trooper Scott Burna

23  who was the lead investigator for the Mass State

24  Police.

25        Q    And do you know who the lead

Richard Craig

7

```
 1      investigator for the Weymouth Police Department was?
 2           A     Captain Thompson, I believe.
 3           Q     Okay.  And when you spoke to -- you
 4      said that Trooper Burna provided you with
 5      information about the crime lab results; is that
 6      fair?
 7           A     Yes.  It is, sir.
 8           Q     Okay.  And when you spoke to Trooper
 9      Burna, what do you recall him telling you about the
10      crime lab results?
11           A     Well, from the notes that you sent me,
12      sir, I recall that Trooper Burna -- may I quote?
13           Q     Certainly.
14           A     He advised me that he learned from the
15      State Police Lab that while the postmortem did not
16      reveal that she had been raped, it did reveal that
17      she had had sex 36 hours or so before death because
18      there were small amounts of sperm deep inside her
19      vagina.  The lab also confirmed small deposits of
20      old sperm in her panties which indicated she had
21      changed her panties some time after her sexual
22      encounter.  The lack of sperm, et cetera, on her
23      body would be consistent with her having showered as
24      had been reported to us earlier.
25           Q     Okay.  And that document you're
```

Richard Craig

8

1    reading from is a document I sent you, correct?

2              A      Yes, sir.  It's Exhibit 5.

3              Q      And that's in the McGilvray

4    deposition?

5              A      Yes, it is.

6              Q      Okay.  And that document is the report

7    you prepared; is that correct?

8              A      Yes, it is, sir.

9              Q      Okay.  And when you prepared that

10   report, you were doing your best to make a true and

11   accurate copy of the information you were provided

12   with, correct?

13             A      Yes, sir.

14             Q      So do you have any independent

15   recollection of the conversation at this time?

16             A      No, I don't.  I really don't.

17             Q      Okay.  So your entire memory is based

18   on what you reviewed, is based on the documents you

19   reviewed?

20             A      Yes, sir.

21             Q      All right.  But you would expect that

22   to be a true and accurate recollection, a true and

23   accurate memorialization of your conversation at the

24   time?

25             A      Yes, sir.

Richard Craig

9

1          Q      Okay.  Once you received that

2     information from Trooper Burna, did that have any

3     influence on how you proceeded to investigate the

4     case?

5          A      No, sir.

6          Q      Okay.

7          A      We were looking at a number of

8     sources.  Jennifer Mullin had a boyfriend.  I don't

9     recall his name right now.  His nickname was Monk.

10    And we attempted to contact him to see if perhaps he

11    had had a relationship with her.

12         Q      So you looked into that possibility?

13         A      Yes, sir.

14         Q      Did you look into -- do you recall any

15    other possibilities you looked into?

16         A      I can't recall at this time, sir.

17         Q      Okay.  And in addition to the Exhibit

18    5 that we've just referred to, and I also sent you

19    Exhibits 3 and Exhibit 4 from the McGilvray

20    deposition; is that correct?

21         A      Yes, you did, sir.

22         Q      All right.  And with regard to Exhibit

23    3, do you recognize the handwriting on that exhibit

24    at all?

25         A      No, I don't, sir.  I know that it's

Richard Craig

10

1    not mine.

2         Q    All right.  Does the name Mike

3    Milligan mean anything to you?

4         A    Yes.  He's a Weymouth police officer.

5         Q    Did you know him at this time that

6    this was happening in 1993?

7         A    No.  Any relationship I had with him

8    developed as a result of this case.

9         Q    Okay.  Did you interact with him about

10   this case at all?

11        A    No.  Not to any great degree.

12        Q    Okay.  Did you interact with him after

13   this case?

14        A    No, sir.

15        Q    And that refers to Chemist Mary

16   Lumley?

17        A    Mary Lumley is a State Police chemist,

18   or she was at that time.

19        Q    And did you know her?

20        A    No, sir.

21        Q    Okay.  Did you know who she was?

22        A    I knew that she was a State Police

23   chemist.  And I understand that she was the one who

24   had done some of the post mortem work on Jennifer's

25   body fluids, I guess.

Richard Craig

11

1          Q      Okay.  But you don't recall meeting
2    her personally or having any conversations with her?
3          A      Not that I recall.  I'm not saying
4    it's impossible, but not that I recall.
5          Q      Okay.  And with regard to Exhibit
6    Number 4 in the McGilvray deposition --
7          A      Yes.
8          Q      -- do you recognize the handwriting on
9    that exhibit?
10         A      Yes, sir.  That's my handwriting.
11         Q      That's your handwriting.  All right.
12                And there is a note on that exhibit at
13   10:34 a.m.?
14         A      Yes, sir.
15         Q      And that's says -- can you just read
16   that to us?
17         A      10:34 a.m. Mary Lumley.  Old semen.
18   Night before may have had sex Thursday or Friday
19   afternoon.
20                And I've got the word Curtis with a
21   question mark after it.
22         Q      Okay.  Do you recall what the word
23   Curtis meant, sir?
24         A      I really don't at this point, sir, no.
25         Q      Okay.

12

1         A     I don't want to conjecture on it

2  because, you know.

3         Q     That's fine.  Is this note, you said

4  this page is your handwriting, correct?

5         A     Yes, sir.

6         Q     Can you tell us why it was prepared?

7         A     I just tried to keep a running journal

8  so that when I got back to the station I could

9  refresh my memory so I could prepare a more formal

10  report.

11         Q     So these are notes that you took in

12  preparation for a report?

13         A     Yes, sir.

14         Q     Okay.  Do you recall now whether you

15  spoke directly to Mary Lumley in making that

16  10:30 a.m. notation?

17         A     Sir, I cannot say with certainty that

18  I spoke to her.  I can't really say with certainty

19  that I didn't.  I really -- it evades me.  I'm

20  sorry.

21         Q     Do you recall -- do you recall making

22  that notation at all?

23         A     I made that notation, yes, sir.

24         Q     Okay.  Can you -- is it your

25  recollection that when you made that notation that

Richard Craig

13

1    that was regarding the Mullin case, correct?

2         A     Yes, sir.

3         Q     And when you say "old semen," do you

4    recall if that was information you were -- do you

5    recall where you got that information from?

6         A     I believe it was a conversation with

7    Trooper Burna, Scott Burna, but I cannot be

8    absolutely certain.

9         Q     So you believe this may be referring

10   to the same conversation that's in your typed

11   report?

12        A     Yes, sir.

13        Q     All right.  Rather than to a

14   conversation directly with Ms. Lumley?

15        A     Yes, sir.  That's correct, sir.

16        Q     Okay.  Do you know how long after

17   making the handwritten note, your typed report would

18   have been prepared?

19        A     I can't say with certainty, sir.

20   Probably within a few days.

21        Q     Okay.  And after -- on that notation

22   after the "old semen," in parenthesis it says:

23   Night before i.e. may have had sex Thursday or

24   Friday afternoon.

25             When you wrote that down that was

Richard Craig

14

1    because someone, either Ms. Lumley or Mr. Burna, had

2    told you that the semen was from the night before

3    the death, correct?

4        A    I believe so, sir.

5        Q    Okay.

6            MS. BADWAY:  Objection.  He has no

7    recollection of talking to Mary Lumley.

8    BY MR. HOPE:

9        Q    All right.  Is there -- do you have

10   any recollection at this point, Detective Craig, of

11   discovering at some point that this information was

12   incorrect regarding the age of the semen?

13       A    Yes, I do recall.  I don't remember in

14   what context.

15       Q    Do you remember when you discovered

16   that?

17       A    No, sir.

18       Q    Do you remember who you discovered

19   that from?

20       A    I believe it was from Assistant

21   District Attorney Tara Wright of the Brockton

22   District Attorney's Office.

23       Q    And do you recall what ADA Wright told

24   you?

25       A    Not off the top of my head, sir, no.

McGilvrey
Exhibit No. 4
kmm. 6 / 3 /08

10:20ᴬ Checked around 94 High St. (Bazzi's) where took Form
(183·JG-C / Parked in yard).

✗ 10:34ᴬ Many Lumley — gave semen — (nite Before) he.,
men have had sex Th — Or' Fri afternoon).
Curtis: ?

10:40 Gave SB map of area

10:45 SB Paula L — to ✓ on ▮▮▮ activities
Th.

10:45 396-AFL @ 136 Pond St.
(Did murder scene to Boot via
Ward etc)

11:00ᴬ Rte 228 to Wey to Sharp to Rolp.G.
Talbott up to Columbrero Sq.

CHRISTIK Roots
TWIN CITY
Hollis
WALGREEN
PLEASANT PIZZA
VIDEOSONICS
331-1400

11:30 CPT. RUMBLE.
11:40 To Quincy — Fennell St. (St Ann's Ch to
Willeston Beb). — 55 Fennel L — They might
be related to friend of Mumu

G.

HOMICIDE INVESTIGATION
Rockland Police Department
Report Number 02-33-01
Supplement by Det. Sgt. Richard Craig
05 Feb 93  Friday

11:20am  Received call from CPT Rumble, Weymouth PD. He has
         gotten a call from Kelly Johnston, Hingham. She
         stated to me that on the morning of
         30 JAN 93, at about 6:30 – 6:45am, she got up like
         she does every Saturday morning, and drove to Wey-
         mouth to buy donuts. She said that just after the
         Weymouth line, as she headed north, she observed a
         black boot in the middle, on the center line, of
         High Street. She said that she is reporting this
         now, as she has just learned more about the
         "missing" boot from reading the paper.

         Her information is:

              Kelley Johnston
              103 HIgh Street
              Hingham, Mass.
              740-4369



Exhibit No. 5

11:05am  Spoke to Off. McCracken, Hingham Police Department.
         He said they had recently removed guns from the
         home of a party named

                   ROBERT W. MROZ
                   15 Spruce St.
                   Hingham, Mass.
                   DOB: 06/04/59

         He said this party had recently beaten up his girl-
         friend, and when he came to reclaim guns which had
         been taken away from him when she obtained a 209A,
         he took McCracken aside and stated he'd been a
         neighbor once of the ██████ family, and wasn't it
         ashame about ████████?

         McCracken thinks Mroz is kind of strange, and
         thought that the situation was strange. He watched
         Mroz leave the station parking lot (It was about
         9:00pm ) and noted that the car looked like an
         older, "boxie" looking car, and appeared to be
         light blue.

11:10am  I spoke with

                   CHERYL SACHETTI
                   WEYMOUTH HIGH SCHOOL EMPLOYEE
                   340-2580



         Last night, Trp. Berna had advised me that he'd
         learned from the State Police Laboratory that while
         the post mortem did not reveal that she'd been
         raped, it did reveal that she'd had sex
         approximately 36 hours or so before death.



HOMICIDE INVESTIGATION
Rockland Police Department
Report Number 02-33-01
Supplement by Det. Sgt. Richard Craig
05 Feb 93  Friday

there were small amounts of sperm deep inside her vagina.  The lab also confirmed small deposits of "old" sperm on her panties, which indicated she had changed her panties some time after her sexual encounter.  The lack of sperm, etc., on her body would be consistent with her having showered, as had been reported to us earlier.

I was contacting the school to determine Jen Mullins' attendance records, in order to help ascertain when she could have had the opportunity to have had sex prior to her murder, and possibly with whom.

On the phone,

1

1                                    Volume I

2                                    Pages 1 to 67

3                                    Exhibits 1 to 5

4              UNITED STATES DISTRICT COURT

5              DISTRICT OF MASSACHUSETTS

6

7                          C.A. No. 05-11649-GAO

8    - - - - - - - - - - - - - - - - - - x

9    WILLIAM JEWETT, JR.,                  :

10             Petitioner,                 :

11                                         :

12        vs.                              :

13                                         :

14   BERNARD BRADY,                        :

15             Respondent.                 :

16   - - - - - - - - - - - - - - - - - - x

17           DEPOSITION OF MARY McGILVRAY

18           Tuesday, June 3, 2008

19           9:57 a.m. to 11:35 a.m.

20           Cunha & Holcomb, P.C.

21        One State Street, Suite 500

22           Boston, MA 02109-3507

23

24      Reporter:  Kathleen M. Madden, CSR

Mary McGilvray

2
APPEARANCES:

CUNHA & HOLCOMB, P.C.
By John H. Cunha, Jr., Esq., and
Charles Allan Hope, Esq.
One State Street, Suite 500
Boston, MA 02109-3507
617-523-4300
On behalf of the Petitioner

OFFICE OF THE ATTORNEY GENERAL
By Eva M. Badway, Esq.
One Ashburton Place
Boston, MA 02108
617-727-2200 Ext. 2824
On behalf of the Respondent

Mary McGilvray

3

1                           I N D E X

2

3    EXAMINATION OF:

4    MARY McGILVRAY

5

6                           DIRECT

7        By Mr. Hope              4

8

9                        *  *  *  *  *

10

11                        E X H I B I T S

12   NO.                                            PAGE

13   1        Notice of deposition                    4

14   2        Case file                               5

15   2-A      Handwritten document                   19

16   3        Handwritten document                   44

17   4        Handwritten document                   44

18   5        Document entitled "Homicide

19            Investigation"                         44

20

21

22        (Exhibits retained by Attorney Cunha)

23

24

Mary McGilvray

47

1    Q.  Do you have any recollection of having

2    conversations with officers about this case?

3    A.  The only conversation I remember is as we

4    prepared for trial.  I don't have a specific memory

5    of any conversations prior to that.

6                    FURTHER DIRECT EXAMINATION

7    BY MR. CUNHA:

8    Q.  With respect to the information that is in

9    this note, for instance, it says, "Blood typing and

10   semen sample is not possible due to the size and

11   lack of certain chemical properties," is that

12   accurate?

13   A.  It would be destructive, yes, in totality --

14   Q.  I hadn't finished reading it, but it says,

15   Lack of certain chemical properties to attempt such

16   a trial would result in destruction of the sample.

17   Is that accurate?

18   A.  The part about the chemical properties is

19   not accurate.  The part blood typing of the semen

20   sample, I would say would not be recommended due to

21   the fact that it would destroy the sample.  That

22   would be an accurate statement.

23   Q.  It is accurate, also, the next sentence that

24   says "It is DNA viable" --

Mary McGilvray

48

1        MS. BADWAY:  Excuse me.  She didn't say

2  it was accurate.  You said it is also accurate.

3     Q.  With respect to the next sentence, which

4  says "DNA viable should we want to do that," is that

5  accurate?

6     A.  Yes.

7     Q.  In fact, DNA testing was done on this

8  sample?

9     A.  Yes.

10     Q.  With respect to the information that's

11  contained in the first part, that is, "Sexual

12  contact with the victim was approximately 24 to 30

13  hours prior to death, not less than 24 hours," is

14  that accurate?

15     A.  Not in my opinion.

16     Q.  Do you have any information as to where that

17  information came from?  You will agree that it seems

18  to say "FM, from chemist Mary Lumley"?

19     A.  I can't really make out that first part, but

20  it does seem to be a note indicating --

21     Q.  A conversation with you?

22     A.  Or information about me or from me.

23     Q.  With respect to the information contained in

24  this first sentence, again, do you have any idea why

Mary McGilvray

49

1    an officer would write that as coming from you, that

2    information as coming from you?

3        A.  I do not know why a person would write those

4    notes in his notes.

5        Q.  Have you ever provided such information in

6    any case?

7        A.  I've never provided information like that in

8    a definitive way, absolutely not.

9        Q.  What do you mean by a "definitive way"?

10       A.  Oftentimes, as a scientist, I do engage in

11   discussions with people about the longevity of sperm

12   or how long you might expect to find sperm in a

13   vaginal cavity after an event happens, those are in

14   no way intended to be interpreted as a definitive

15   result in a case.  This is information that's out

16   there in the literature that somebody could

17   reference if they wanted to see how long sperm could

18   be detected in the vaginal cavity.

19       Q.  When you say "in the literature," what

20   literature are you referring to?

21       A.  There are scientific journals that publish

22   research about those sorts of things.  I don't know

23   offhand the name of one that would have this sort of

24   information in it; however, a common forensic

Mary McGilvray

50

1  journal is a journal of forensic science.

2      Q.  Did you consult any such journals prior to

3  your testimony today?

4      A.  No.

5      Q.  Do you recall if you consulted any such

6  journals prior to or around the time of your

7  examination of the vaginal swabs and smears in this

8  case, that is in 1993?

9      A.  No, I wouldn't have consulted journals in

10  relation to this case, no.

11      Q.  So do I understand your testimony to be that

12  in speaking to an officer, you might say that

13  something is consistent with a certain time period

14  but it is not scientifically definitive?

15      A.  No, absolutely not, absolutely not correct.

16      Q.  So if this were to be attributed to you by

17  him -- I'm asking you to assume that -- he would

18  have had to have made up that first sentence?

19      A.  No.  He would have had to taken information

20  out of context and interpreted it in his own way to

21  put in his own notations for his own use.  It

22  wouldn't have been a result from me, because my

23  results are contained in that report that comes from

24  the laboratory.  So I can't explain why somebody

Mary McGilvray

51

1   would write something in their notes as being

2   factual.  But I can say, as a scientist, I do try to

3   discuss scientific information with laypeople who

4   might not understand everything that I'm trying to

5   say and what's factual and what's just theoretical.

6        Q.  You will agree with me that the information

7   in that first paragraph is pretty specific.  That

8   is, that there is a time limit of a six-hour span,

9   that is 24 to 30 hours prior to death?

10       A.  That is very specific, yes.

11       Q.  And not less than 24 hours is even more

12  specific?

13       A.  That's correct.

14       Q.  Can you tell us what the context would be

15  for such specificity --

16              MS. BADWAY:  She can't surmise.

17              MR. CUNHA:  I'm asking the question, and

18  she can answer however she wishes.  Whatever

19  evidentiary value it has is up to the judge.

20       Q.  Can you tell us what is the context by which

21  information you give would have such specificity?

22       A.  I can't, because I wouldn't give such

23  specific information.  There is no way I can

24  scientifically give such a specific answer related

Mary McGilvray

52
1  to any piece of evidence.  That would be impossible
2  for me to do.
3       Q.  So, assuming, again, that this is a note
4  from the officer relating in conversation with you,
5  with respect to the specificity, that is the 24 to
6  30 hours and the not less than 24 hours, that would
7  have had to have been made up by him?
8       A.  Conversations go two ways, so I'm telling
9  you I did not provide that information with such
10 specificity to be placed in a note like that.
11 Absolutely not.
12      Q.  I understand what you're saying.  What I'm
13 trying to determine is, what context could there be
14 that would have such numbers that would be
15 misinterpreted or -- if he didn't make it up, what
16 is the context in which that could appear in a
17 conversation with you whether it's misunderstood or
18 not?
19      A.  If you ask me a question, a very specific
20 question and I answer you, there's a possibility
21 that you don't hear my answer.  All you hear is your
22 question.  I don't know if that happened in this
23 situation.  I can't say why he wrote that down.
24 That's not my answer.  That might have been his

Mary McGilvray

53

1    question, but that is not my answer.

2                    FURTHER DIRECT EXAMINATION

3        BY MR. HOPE:

4        Q.  Let's go to the next one.  This has been

5    marked Exhibit 4.  It's also from one of the

6    materials you've reviewed in preparing for this; is

7    that correct?

8        A.  Yes.

9        Q.  Drawing your attention to the starred

10   section, there's a number of dated notes.  Can you

11   just read the note that's at 10:34 a.m.

12       A.  That note says, Mary Lumley, old semen.  In

13   parentheses then it says, Night before, i.e., may

14   have had sex TH or FRI afternoon.  Then it says

15   Curtis question mark.

16       Q.  This doesn't actually specify which officer

17   it came from, but do you recall having a

18   conversation about in which you might have described

19   the semen as old semen with an officer in this case?

20       A.  I don't recall having this conversation, but

21   as I've described in relation to the sperm cells in

22   this case, being head and having no tails, then it

23   wouldn't be uncommon for somebody to interpret my

24   explanation of recent versus nonrecent as being old

Mary McGilvray

54

1  semen, so this notation potentially could have been

2  attributed to a conversation I had with this person;

3  however, I don't have any recollection of this

4  conversation.

5      Q.  And with regard to the portion in the

6  parentheses, Night before may have had sex TH --

7  let's assume that means Thursday or FRI, Friday

8  afternoon -- might you have said something that

9  would have attributable to that?

10     A.  I have no recollection of that, but I don't

11 think I would have said anything like that.  And in

12 fact I interpret this notation as being a notation

13 that's separate from the conversation type notation

14 that this might be the person's own thoughts that

15 they are putting into this notation.

16     Q.  Does the name Curtis mean anything to you in

17 the context of this case?

18     A.  It does not.

19              FURTHER DIRECT EXAMINATION

20 BY MR. CUNHA:

21     Q.  Do you know Dr. Curtis, the pathologist?

22     A.  No.  I might have seen the name on documents

23 that came to the lab, but I don't even recall that.

24     Q.  Do you ever speak to the pathologist in a

Mary McGilvray

55

1    case?

2        A.  No.

3                    FURTHER DIRECT EXAMINATION

4        BY MR. HOPE:

5        Q.  Moving on to Exhibit 5.  This is something

6    you reviewed prior to this deposition.  If I can

7    draw your attention to the starred paragraph at the

8    bottom of Page 1 of this two-page exhibit and then

9    continuing on to the second page.  Can you just read

10   that paragraph for us.

11       A.  Yes.  "Last night Trooper Berna had advised

12   me that he learned the state police laboratory that

13   while the postmortem did not reveal that she had

14   been raped, it did reveal that she had sex

15   approximately 36 hours or so before death because

16   there were small amounts of sperm deep inside her

17   vagina.  The lab also confirmed small deposits of,

18   quote/underquote, old sperm on her panties which

19   indicated she had changed her panties sometime after

20   her sexual encounter.  The lack of sperm, et cetera,

21   on her body would be consistent with her having

22   showered as had been reported to us earlier."

23       Q.  Would the -- the state police laboratory is

24   where you work, correct?

Mary McGilvray

56

1   A.  That's correct.

2   Q.  Would there have been anyone else at the

3   state police laboratory working on this case that

4   the trooper might have spoken with?

5   A.  I don't know.  I was the only one working on

6   the case, but I don't know if he would have spoken

7   to anybody else about the case.

8              FURTHER DIRECT EXAMINATION

9   BY MR. CUNHA:

10  Q.  Do you know Trooper Berna?

11  A.  Yes, I know him.  I don't know him now.  I

12  wouldn't recognize him if I saw him now, but I had

13  met him back at the time of this case, yes.

14             FURTHER DIRECT EXAMINATION

15  BY MR. HOPE:

16  Q.  Do you have any recollection of having a

17  conversation with him about this case?

18  A.  No specific recollection, no.

19  Q.  Again, just briefly, we've only spoken so

20  far about the sperm collected from the hospital

21  specimen kit in this case, correct?

22  A.  That's correct.

23  Q.  There was actually a second site from which

24  sperm was located, correct, from the panties?

McGilvray
Exhibit No. 4
Juan 6 / 3 / 08

10:20ᴬ Cicked around 94 High St. (Sazo's) where bost Par
(183·JG-C / Parked in yard).

✗ 10:34ᴬ Mony (Wmley - gold Demen - (nite Before) he,
mon here hed sex Th — or Fri afternoon.)

— Curtis: ?

10:40  Gave (SB) map of area.

10:45  (SB)  Paula L — to ✓ on ▓▓▓ activitie's
Th.

— 10:45  396-AFL @ 136 Pine St
(Did murder scene to Boot via
Ward etc)

11:00ᴬ Rte. 228 to Wey to Sharp to Reip's
— Talbott — up to Columbran Sq.



11:30  CPT. RUMBLE.
11:40  To Quincy — Ferrell St. (St. Ann's Ch to
Willeston Beb) — 55 Ferrel l — They might
be releted to freinl of Mums



HOMICIDE INVESTIGATION
Rockland Police Department
Report Number 02-33-01
Supplement by Det. Sgt. Richard Craig
05 Feb 93  Friday

11:20am  Received call from CPT Rumble, Weymouth PD. He has
gotten a call from Kelly Johnston, Hingham.  She
stated to me that on the morning of
30 JAN 93, at about 6:30 — 6:45am, she got up like
she does every Saturday morning, and drove to Wey-
mouth to buy donuts.  She said that just after the
Weymouth line, as she headed north, she observed a
black boot in the middle, on the center line, of
High Street.  She said that she is reporting this
now, as she has just learned more about the
"missing" boot from reading the paper.

Her information is:

Kelley Johnston
103 HIgh Street
Hingham, Mass.
740-4369



McGilvray
Exhibit No. 5
kmm  6-13/08

11:05am  Spoke to Off. McCracken, Hingham Police Department.
He said they had recently removed guns from the
home of a party named

ROBERT W. MROZ
15 Spruce St.
Hingham, Mass.
DOB:  06/04/59

He said this party had recently beaten up his girl-
friend, and when he came to reclaim guns which had
been taken away from him when she obtained a 209A,
he took McCracken aside and stated he'd been a
neighbor once of the ██████ family, and wasn't it
ashame about ███████?

McCracken thinks Mroz is kind of strange, and
thought that the situation was strange.  He watched
Mroz leave the station parking lot (It was about
9:00pm ) and noted that the car looked like an
older, "boxie" looking car, and appeared to be
light blue.

11:10am  I spoke with

CHERYL SACHETTI
WEYMOUTH HIGH SCHOOL EMPLOYEE
340-2580

Last night, Trp. Berna had advised me that he'd
learned from the State Police Laboratory that while
the post mortem did not reveal that she'd been
raped, it did reveal that she'd had sex
approximately 36 hours or so before death.



HOMICIDE INVESTIGATION
Rockland Police Department
Report Number 02-33-01
Supplement by Det. Sgt. Richard Craig
05 Feb 93  Friday



there were small amounts of sperm deep inside her vagina.  The lab also confirmed small deposits of "old" sperm on her panties, which indicated she had changed her panties some time after her sexual encounter.  The lack of sperm, etc., on her body would be consistent with her having showered, as had been reported to us earlier.

I was contacting the school to determine Jen Mullins' attendance records, in order to help ascertain when she could have had the opportunity to have had sex prior to her murder, and possibly with whom.

On the phone,